[Cite as *State v. Trent*, 2017-Ohio-7133.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 16AP-707 |
| v. | : | (C.P.C. No. 15CR-432) |
| Terrance Trent, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on August 8, 2017

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Steven L. Taylor*, for appellee.

**On brief:** *Todd W. Barstow*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Terrance Trent, appeals a judgment entered by the Franklin County Court of Common Pleas on September 12, 2016. The trial court sentenced him to serve a maximum consecutive term of 13 years in prison following a jury trial in which he was found guilty of the aggravated vehicular homicide of Stephanie Fibelkorn and William Lewis, Jr. and the vehicular assault of Brenda Detty and Mamie Adams. We find in our review that the convictions were supported by the evidence and affirm the judgment of the trial court.

I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On December 12, 2014, at around 10:00 a.m., Fred Armstrong was riding his bicycle on the north side of Broad Street between Grant and Cleveland Avenues as part of his security job. (Trial Tr. Vol. 1 at 49-50, filed Jan. 4, 2017; State Ex. M1.) He heard a

loud noise, like metal on concrete, and saw a red truck heading west on Broad Street, speeding past other drivers with a blown front passenger tire, the exposed rim throwing sparks from the roadway as it went.  (Tr. Vol. 1 at 51-53.)  He observed it run a red light at the next intersection before he lost sight of it.  (Tr. Vol. 1 at 53-54.)  Its speed was so excessive under the circumstances, Armstrong thought it was being chased by the police but he did not observe any police cars.  (Tr. Vol. 1 at 51.)

{¶ 3}  A short way west on Broad Street, pedestrians Ross Willis and Daniel Helber were positioned near the intersection of Fifth and Broad Streets. (Tr. Vol. 1 at 58-59, 85; Pl. Ex. M1.)  Willis had just crossed Broad and arrived at that corner when he heard a "God awful metal on metal noise" and saw a red truck driving at highway speeds with no front tire on the rim and sparks "flying off it."  (Tr. Vol. 1 at 58-59.)  Willis observed a driver and passenger and thought they must have robbed a bank to be driving in such a manner.  (Tr. Vol. 1 at 59, 64-65.)  He saw the truck drive on the wrong side of the road in order to avoid traffic and run the light at Fourth Street.  (Tr. Vol. 1 at 61.)  The truck was being driven, he would later testify, with "complete disregard for property [and] human life."  (Tr. Vol. 1 at 59.)  Helber also testified that the truck was driving aggressively and fast with a missing tire while swerving around traffic.  (Tr. Vol. 1 at 86.)  Helber confirmed that it ran the red light on Fourth Street.  (Tr. Vol. 1 at 87.)

{¶ 4}  Stan Kronenberger, Adam Grate, and Matthew Collins were all near the intersection of Broad and Third Streets.  (State Ex. M1.)  Kronenberger, a pedestrian, was on the north side of Broad just east of Third Street.  *Id.*  Collins was stopped in his eastbound vehicle on Broad Street, west of the traffic light at the intersection of Third and Broad.  (Tr. Vol. 2 at 131-32; Pl. Ex. M1.)  Grate, a pedestrian, was west of the intersection, in the process of cutting across the Ohio Statehouse grounds on foot toward the corner of Third and Broad.  (Tr. Vol. 1 at 90; Pl. Ex. M1.)  Kronenberger saw the truck "barreling" through the light at Fourth Street driving on its exposed rim.  (Tr. Vol. 1 at 71-72.)  It veered toward him on the sidewalk before veering back toward the eastbound traffic.  *Id.*  Collins observed the red truck speed through the red light at Third Street, nearly clipping his car as it passed.  (Tr. Vol. 2 at 132-33.)  Collins saw the driver, a white man in his 50s or 60s with a beard, glance over at him as he sped by.  (Tr. Vol. 2 at 133-34.)  Grate also

saw the red truck, an older Chevrolet, speed through the light at Third Street while riding on a flat tire.  (Tr. Vol. 1 at 91-92.)

{¶ 5}  On the corner of High and Broad Streets, the intersection immediately to the west of Third and Broad, Terry Balduff had just emerged on foot from a restaurant where he had eaten breakfast.  (Tr. Vol. 2 at 137-38.)  He is a school bus driver and had driven students to the Ohio Theatre for a field trip that morning.  *Id.*  The students were not yet finished at the Ohio Theatre, so he loitered on the corner watching people.  *Id.*  It was a beautiful December day, he would later testify.  *Id.*  Then he heard a "horrible racket" – a truck tearing down Broad Street "crazy fast" with no front tire, driving as if someone were chasing it.  (Tr. Vol. 2 at 138-39.)  A school bus entered the Broad and High intersection traveling southbound on High; there were 17 seconds left on the crosswalk signal for pedestrians crossing Broad Street, and Balduff, with "utter shock, utter dismay," realized the driver of the speeding truck was not going to stop.  (Tr. Vol. 2 at 140.)

{¶ 6}  The driver of the school bus in the intersection, Brenda Detty, was transporting special needs students from high school and a career center to jobs downtown.  (Tr. Vol. 2 at 155-56.)  The traffic light was green for High Street traffic as she was proceeding through the intersection across Broad Street.  (Tr. Vol. 2 at 158.)  West of the bus, pedestrian Ronne Herman had just walked across Broad Street and made his way to the sidewalk at the southwest corner of Broad and High.  (Tr. Vol. 1 at 101-02.)  Stephanie Fibelkorn and William Lewis, Jr., as multiple videos of the collision would later show, were still in the crosswalk on the west side of High Street crossing Broad when the truck struck.  (State Ex. V2 at 1:18-1:32; State Ex. V1 at 1:31-1:41.)

{¶ 7}  Kronenberger, Grate, Collins, and Balduff all watched as the truck sped through the red light at Broad and High and smashed into the school bus, which then slid into the southwest corner of High and Broad after the impact.  (Tr. Vol. 1 at 73-74, 93; Tr. Vol. 2 at 134, 141-42.)  Herman, on the sidewalk at the southwest corner of Broad and High, heard the collision behind him and retreated from the sliding bus, narrowly escaping with his life.  (Tr. Vol. 1 at 104.)  But the videos show Fibelkorn and Lewis disappeared in a massive cloud of dust and smoke as the mangled vehicles came to rest on the corner.  (State Ex. V2 at 1:18-1:32; State Ex. V1 at 1:31-1:41.)  In the wake of the truck,

Balduff would later testify, "it got deadly quiet there on the corner. It was absolute silence. And the light pole slowly fell over." (Tr. Vol. 2 at 141.)

{¶ 8} On January 29, 2015, a Franklin County Grand Jury indicted the driver of the truck, Trent, for two counts of aggravated vehicular homicide for the deaths of Fibelkorn and Lewis, and two counts of vehicular assault for the injuries caused to his passenger (Adams) and the bus driver (Detty). (Jan. 29, 2015 Indictment). The Common Pleas Court held a jury trial on August 8th through 11th, 2016. At trial, in addition to the eye-witness testimony discussed here, the State presented evidence from a number of officers and persons who responded to the scene.

{¶ 9} Armstrong testified that he arrived at High and Broad after the accident and positively identified the truck as the same one that careened by him with a missing tire near the intersection of Grant and Broad. (Tr. Vol. 1 at 55.) Willis also agreed that the truck which struck the bus was the same that had passed him at high speed with a missing tire in "complete disregard for property [and] human life." (Tr. Vol. 1 at 59, 62-64.) Grate and Herman both recounted how they had approached the accident in an attempt to help. (Tr. Vol. 1 at 93-94, 105.) Herman saw Fibelkorn underneath the bus, near the entrance door. (Tr. Vol. 1 at 107.) She appeared to already be dead. *Id.* Herman helped the special needs children (who were uninjured) off the bus. (Tr. Vol. 1 at 105.) Both Grate and Herman noted that the driver of the truck, who was later identified as Trent, was crumpled against and underneath the steering wheel, moaning. (Tr. Vol. 1 at 95-96, 108.)

{¶ 10} Officer David Larrison of the Columbus Division of Police witnessed the crash from within his police van situated several blocks away and, through use of his lights and siren, was able to arrive at the scene within approximately ten seconds. (Tr. Vol. 2 at 192-94.) He also saw Fibelkorn's body and testified that she appeared to be severely injured. (Tr. Vol. 2 at 194-95.) Lewis was under the bus lying in glass and there was nothing Larrison could do for him until further help arrived. (Tr. Vol. 2 at 197-98.) Larrison identified Trent as the man who was driving the truck that day and testified that he attempted to speak to him at the scene. (Tr. Vol. 2 at 195-96.) But Trent, who was stuck in the floorboard area of the truck, was moaning with pain at the time and was not communicative. *Id.*

{¶ 11} While Trent was being treated at a hospital soon after the collision, a Columbus Police Sergeant, Nicholas Konves, interviewed him to attempt to ascertain if drugs or alcohol had played a role in the crash. (Tr. Vol. 2 at 200-01.) Konves testified that, in his opinion, Trent was not under the influence of drugs or alcohol at the time of the crash. (Tr. Vol. 2 at 207.)

{¶ 12} Two accident investigators also testified. Columbus Police Sergeant, Brooke Wilson, testified that because the truck was missing its front passenger tire, she was able to trace the gouge marks it made from Fifth Street all the way to the accident scene. (Tr. Vol. 2 at 218-33.) That the truck had a flat or shredded tire during much of its journey down Broad Street was corroborated, she said, by the shredded state of the tire remnants and by video showing the truck, already with little tire left on the rim, speeding through the intersection of Grant and Broad. (Tr. Vol. 2 at 220-21, 241, 244-45; State Ex. V3 at 3:15-3:20.) Wilson stated that the marks on the roadway show that at some junctures, Trent was driving in oncoming traffic. (Tr. Vol. 2 at 225; State Ex. 16.) With a missing or shredded front passenger tire, she explained, the truck would have been pulling to the right and, had Trent left it to its own devices, the truck would have driven into the curb. (Tr. Vol. 2 at 233.) In order to drive straight or left of center, she concluded, Trent had to have been steering. *Id.* She also noted the skid marks and gouge marks on the road showed heavy braking by Trent just before the collision. (Tr. Vol. 2 at 234.)

{¶ 13} In conjunction with a stipulation on traffic light patterns and the video evidence of the crash which shows the pedestrian signals, Wilson testified that the Broad Street light was solid red when Trent plowed through the intersection. (Tr. Vol. 2 at 242-43, 254-61, 265; State Ex. V1.) She added that the speed limit on the relevant stretch of Broad Street was 30 m.p.h. (Tr. Vol. 2 at 216.)

{¶ 14} Columbus Police Detective, Mark Rice, also testified. He explained that he used accident reconstruction calculations to attempt to determine the minimum speed Trent's truck could have been traveling when it struck the school bus. (Tr. Vol. 2 at 270-78.) Accident reconstruction using conservation of linear momentum calculations resulted in a determination that Trent was going at least 47 m.p.h. when he struck the bus and could have been traveling faster. (Tr. Vol. 2 at 276.) Accident reconstruction using

crush energy analysis calculations showed that Trent was driving at least 45 m.p.h. when he collided with the bus and may have been traveling faster.  (Tr. Vol. 2 at 277-78.)

{¶ 15} Rice testified that after he reached these conclusions following his calculations, he consulted data obtained from Trent's truck's airbag controller.  (Tr. Vol. 2 at 287-89.)  The data from the controller showed that systems in the truck (at least those monitored by that module) were operating correctly.  (Tr. Vol. 2 at 279-82; State Ex. 112.)  The controller also recorded data regarding the truck's speed, braking, and throttle position in the seconds prior to the crash.  (Tr. Vol. 2 at 283; State Ex. 112 at 3.)  The data showed that from five to three seconds prior to the collision, Trent was using 85 percent throttle and accelerated from 57 to 63 m.p.h.  (State Ex. 112 at 3.)  Two seconds before the collision, he applied the brakes and slowed from 63 m.p.h. to 47 m.p.h.  *Id.*  The data also showed that one second before the airbag deployment, Trent's foot came off the brake and engaged 100 percent throttle.  *Id.*

{¶ 16} The parties stipulated that both Fibelkorn and Lewis died of blunt force injuries sustained in the collision.  (Tr. Vol. 2 at 292-94.)  Detty testified that she sustained a concussion and emotional injuries which caused her to miss two months of work. (Tr. Vol. 2 at 165-66.)  Adams said that she sustained a broken thigh bone, a broken hip, a concussion, and damaged intestines.  (Tr. Vol. 2 at 180-81.)

{¶ 17} Both Mamie Adams and Terrance Trent testified to some extent about the trip down Broad Street.  Adams testified that she was dating Trent.  (Tr. Vol. 2 at 169-70.)  She said he was not in a good mood the morning of the accident and that she was drunk and hungover, having consumed two "Four Lokos" the night before.  (Tr. Vol. 2 at 173-75.)  She said she was not aware that the truck had any mechanical problems and it seemed to be running fine.  (Tr. Vol. 2 at 177-78.)  She confirmed that Trent was driving and that they began the journey in Whitehall on Broad Street.  (Tr. Vol. 2 at 178.)  However, she testified that the last thing she remembered, before waking up in the hospital, was seeing Lowes and McDonald's in Whitehall.  (Tr. Vol. 2 at 179-80.)

{¶ 18} Trent testified that he was on his way to a church acquaintance's house to help her with a plumbing problem.  (Tr. Vol. 2 at 323-24; *see also* Tr. Vol. 2 at 305, 309-13 (two witnesses confirmed that Trent had indeed planned to help a church acquaintance with a plumbing problem).)  Trent said that he had been up late the night before working

and did not arrive home until close to 2:00 a.m. (Tr. Vol. 2 at 319.) Adams came to his house early in the morning still inebriated from a night out, pushed her way in, and went to sleep in his bed. (Tr. Vol. 2 at 319-23.) Rather than fight with her to compel her to leave, he joined her and went back to sleep. (Tr. Vol. 2 at 323.) Trent awoke at 8:30 or 9:00 a.m. and began to prepare to go fix plumbing. (Tr. Vol. 2 at 323-24.) Thinking he was intending to see another woman, Adams became enraged and began slapping him. (Tr. Vol. 2 at 324-25.) Trent decided to take her with him so she could observe that all he was doing was fixing plumbing. *Id.*

{¶ 19} On the way to the plumbing job site, they stopped at Lowes on Broad Street to obtain supplies. (Tr. Vol. 2 at 325-26.) However, Trent had forgotten his wallet. (Tr. at 327.) Still, he decided to go to the job site anyway without the supplies if only just to prove the truth to Adams. (Tr. Vol. 2 at 327-28.) So they left Lowes and began the journey down Broad Street. According to Trent, Adams was yelling at him and he began to panic, as he always did when she yelled at him. (Tr. Vol. 2 at 328-29.) When she moved to grab a soda from the back seat of the truck he told her she could not have it because they were for a church event but, in her intoxicated and hungover state, she became even angrier and took the soda anyway. (Tr. Vol. 2 at 329-30.)

{¶ 20} According to Trent, somewhere in the journey along Broad Street she began to hit him with the unopened soda can. (Tr. Vol. 2 at 331.) He did not pull over, he testified, because he had tried that before with her on other occasions and it just made her behavior escalate. (Tr. Vol. 2 at 332.) Instead he "just retreated into someplace" and went into "panic mode." (Tr. Vol. 2 at 333.) He maintained that he did not know that he had a flat tire. (Tr. Vol. 2 at 334.) He stated that he was unaware that he was driving over 50 m.p.h. and opined that he was doing a pretty good job driving if he was really going that speed with no front passenger tire. (Tr. Vol. 2 at 339, 346-47.) He said that he remembered Adams hitting him in the face with the can and knocking off his glasses, and the next thing he remembered was someone asking him after the crash if he knew he had a flat tire. (Tr. Vol. 2 at 335-36.) He also testified, however, that he remembered his windshield being filled with the yellow of the bus and that his hands were not on the wheel at that point. (Tr. Vol. 2 at 340.)

{¶ 21} The jury found Trent guilty on all charges. (Aug. 12, 2016 Verdict Forms.) The trial court convicted him and sentenced him to 13 years imprisonment, the maximum sentence permitted by law. (Sept. 12, 2016 Jgmt. Entry.) Trent now appeals.

## II. ASSIGNMENT OF ERROR

{¶ 22} Trent assigns a single assignment of error:

> THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF AGGRAVATED VEHICULAR HOMICIDE AND AGGRAVATED VEHICULAR ASSAULT AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III. DISCUSSION

{¶ 23} The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶ 24} Sufficiency is:

> "[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley* at ¶ 11, quoting *Thompkins* at 386; *Black's Law Dictionary* 1433 (6th Ed.1990). "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 25} By contrast:

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to

> support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict * * *. Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis added.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's* at 1594.   In a manifest weight analysis "the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony."  *Thompkins* at 388, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982).   " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' "  *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 26}  The Ohio Revised Code defines aggravated vehicular homicide as relevant to the facts of this case as follows:

> (A)    No person, while operating or participating in the operation of a motor vehicle, * * * shall cause the death of another * * * in any of the following ways:
>
> * * *
>
> (2)    * * *
>
> (a)    Recklessly.

R.C. 2903.06(A)(2)(a).  The Revised Code defines vehicular assault in a similar manner:

> (A) No person, while operating or participating in the operation of a motor vehicle, * * * shall cause serious physical harm to another person * * * in any of the following ways:
>
> * * *
>
> (2)    * * *
>
> * * *
>
> (b) Recklessly.

R.C. 2903.08(A)(2)(b).

{¶ 27} In this case, notwithstanding Trent's testimony about "retreating into someplace" and being in "panic mode," it is undisputed that Trent was operating a motor

vehicle that caused death to Fibelkorn and Lewis and serious physical harm to Detty and Adams. (Tr. Vol. 2 at 333.) Thus, Trent's sole point of argument is that he did not recklessly operate his truck on December 12, 2014 when he killed two people and injured two others. (Trent Brief at 3-4.) He argues that he was, at most, negligent. *Id.*

{¶ 28} "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). By contrast, "[a] person acts negligently when, because of a substantial lapse from due care, the person fails to perceive or avoid a risk that the person's conduct may cause a certain result or may be of a certain nature." R.C. 2901.22(D).

{¶ 29} The evidence in this case does not support Trent's assertion that he was not reckless. Driving fast is not always reckless. *Columbus v. Bruner*, 10th Dist. No. 78AP-664, 1979 Ohio App. LEXIS 11294, *5 (May 15, 1979). But the jury did not err in finding that Trent's driving was reckless because he was not simply speeding. More than half a dozen witnesses testified, and video and forensic evidence show, that Trent drove double the speed limit in a truck (with the mass and momentum of a vehicle that size) with a front tire that was not only flat but shredded to the point that the rim was gouging and sparking on the pavement, that he drove left of center, and that he ran every red light that appeared in his path. Taking Trent's contentions about Adams' distracting behavior to be true (and that question was one for the jury), he could have pulled over. He could have let off the gas and stopped applying 85 percent throttle (at which point his truck with no tire on one wheel could reasonably be inferred to have quickly ground to a halt). He could have ceased fighting to steer the truck down the road and let it lodge to the right against the curb. Instead he "disregard[ed] [the] substantial and unjustifiable risk" that he would kill someone with his out-of-control truck, which tragically occurred. R.C. 2901.22(C).

{¶ 30} Trent's convictions were overwhelmingly supported by the evidence. We overrule Trent's sole assignment of error.

## IV. CONCLUSION

{¶ 31} Video evidence, forensic evidence, and more than half a dozen eye-witnesses confirmed that Trent drove his truck recklessly with the result that he killed two people and seriously injured two others. His convictions for aggravated vehicular homicide and vehicular assault were proved with sufficient evidence at trial and

manifestly beyond a reasonable doubt.  We reject his arguments in support of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT and SADLER, JJ., concur.